## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT FOR THREE SMARTPHONES LOCATED AT 275 CHESTNUT ST, MANCHESTER, NH

I, Lori Robinson, having been duly sworn, hereby depose and state:

## AGENT BACKGROUND

1.      I am a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and have been so employed since 2014.  I am currently assigned to the Manchester, New Hampshire field office. As part of my regular duties as an agent, I investigate criminal violations relating to a broad range of immigration and customs related statutes, including those relating to child exploitation, child pornography, and human trafficking.  I have received training in the area of child pornography and child exploitation, and as part of my duties have observed and reviewed numerous examples of child pornography (as defined in 18 U.S.C. §2256) in various forms of media, including digital/computer media.  I have assisted investigations and executed search warrants involving child exploitation and child pornography offenses, including search warrants of electronic devices. I have received training relating to the trafficking in persons, including sex trafficking, and other offenses.

2.      I have participated in investigations of human trafficking, human smuggling, alien harboring, border violations, drug and firearm trafficking, and related offenses.  Many of these investigations have had national or international connections, and many required me to work closely and share information and intelligence with members of other federal, state, and local law enforcement agencies.  I have debriefed defendants, informants, and witnesses who have personal knowledge about human trafficking, including sex trafficking, and other crimes occurring in New Hampshire, nationally, and abroad.

3.      From my training and experience, I know that individuals are trafficked for several purposes.  Some of these purposes are subjection into involuntary servitude, peonage, debt bondage and slavery. Human trafficking is often accomplished through the use of fraud, force and coercion.  I am familiar with the federal and state laws which make it a violation to engage in human trafficking, such as 18 U.S.C. §§ 1581 through 1595 (Peonage, Slavery and Trafficking in Persons), and 18 U.S.C. §§ 2421 through 2428 (Transportation for Illegal Sexual Activity and Related Crimes).

4.      I submit this affidavit pursuant to Federal Rule of Criminal Procedure 41, in support of an application for a search warrant authorizing the search of a Black iPhone seized from SHARATH CHANDRA BOLLU on November 15, 2024, a Gray iPhone seized from KOTESHWARA RAJU JONNAGODDA on November 15, 2024, and a White iPhone, seized from the car in which SHARATH CHANDRA BOLLU and KOTESHWARA RAJU JONNAGODDA were arrested on November 15, 2024, all located at HSI Manchester, 275 Chestnut St, Manchester, NH, as more fully described in Attachment A of this affidavit (the "TARGET DEVICES").

5.      Based on the information set forth in this affidavit, there is probable cause to believe that the TARGET DEVICES contain evidence of, or property intended for use in committing, violations of Title 18, United States Code, Sections 1591(a) and (b)(1), and 1594 (attempted sex trafficking of a minor).  Moreover, I respectfully submit that there is probable cause to believe that a search of the TARGET DEVICES, further identified in Attachment A, for the items and information more particularly described in Attachment B, will yield evidence of the aforementioned violations.

6.      This affidavit is based on my personal investigation and investigation by others, including federal and local law enforcement officials whom I know to be reliable and trustworthy. The facts contained herein have been obtained by interviewing witnesses and examining documents obtained in the course of the investigation as well as through other means. This affidavit does not include every fact known to me about this investigation, but rather only those facts sufficient to establish probable cause.

## FACTUAL BACKGROUND

7.      Beginning on or about November 13, 2024, law enforcement posted identical advertisements (the "Advertisements") on two different regional sites of a website commonly used to advertise prostitution services that contained images of what appeared to depict two young females and the following language:

> "Sweet & tight! Ready 2 have some fun!"
> "In town 4 a limited time only"
> "Cute & very petite girl that is tight from head to toe! Cum over to play with me!"
> "Text for donations. Incall only – safe and discrete location."

8.      The Advertisements listed the age as 99 years old[1] and each contained a contact phone number (the "Advertisement Numbers") that were monitored by law enforcement and operated by an undercover officer ("UC1").

9.      On or about November 14, 2024, the Advertisement Numbers received a text message from a phone number ending in -0801, now known to belong to SHARATH CHANDRA BOLLU ("BOLLU"), in response to one of the Advertisements. Thereafter, a text conversation

---

[1] The website utilized by law enforcement requires users to be at least 18 years old to utilize the website's services.

between UC1 and BOLLU ensued.[2]  UC1 stated that they had two minor girls—ages 12 years old

and 14 years old—available for various sex acts in exchange for money.   The conversation

continued over the course of 24 hours on both November 14 and November 15, 2024. During the

conversation on November 14, 2024, BOLLU agreed to pay $150 to have sex with the 12-year-

old girl:

| BOLLU | Hi |
|-------|-----|
| UC1 | hey hun.. u lookin for a good time? i got two beauties |
| BOLLU | Can I have pics |
| UC1 | i can send one of each.. i have my 12 yo izzy n 14 yo leila both are lots of fun n play well togther too |
| BOLLU | Pic |
| UC1 | u want izzy or leila pic? |
| BOLLU | Both |
| UC1 | this is izzy [picture sent] [3] |
| BOLLU | Leila |
| UC1 | leila [picture sent] |
| BOLLU | Can I have video verification |
| BOLLU | Can I know price |
| UC1 | dont do videos have had guys turn us into the police n im not lookin for trouble. ur not a cop r u? if u are u have to tell me |
| BOLLU | No |
| BOLLU | Can I know price |
| UC1 | rates depend on service.. if u wanna see one girl its hh $150 or hr is $200 if 2 girls is more ur thing hr is $400 n hh is $200 |
| BOLLU | Can u have already another pic |
| UC1 | i dont mk $$ sending pics.. i can send one more. which girl u want? |
| BOLLU | Leila |
| UC1 | isnt she a real beauty [picture sent] |
| BOLLU | I sorry izzy |

---

[2] At different times, the number ending in 0801 was communicating with each of the two
Advertisement Numbers.

[3] Photographs sent did not depict actual minors.

4

| BOLLU | Please |
|-------|--------|
| BOLLU | There |
| UC1 | this is izzy but no more pics!! [picture sent] |
| BOLLU | Ok can I have location |
| UC1 | which girl u want?? |
| BOLLU | Izzy |
| UC1 | n what service |
| BOLLU | Which will you provide |
| UC1 | hr its $300 n hh is $150.. xtras r more $$ |
| BOLLU | Hh |
| UC1 | do u want bare or u wanna bring condoms? bare is $50 more.. izzy doesnt do anal bc shes still little |
| BOLLU | I don't have condom |
| BOLLU | No bare |
| BOLLU | Can I have location |
| UC1 | can u get condoms since u dont want bare.. it would be $150 for half hour |
| BOLLU | Ok |
| BOLLU | Location |
| UC1 | what time u wanna come? |
| BOLLU | Iam thinking |
| BOLLU | I want to come now |
| BOLLU | There |
| BOLLU | Hlo |
| UC1 | were in manchester hun how far are you? |
| BOLLU | Lowell |
| UC1 | i dont know where that is lol but were at the ███████ hun |
| UC1 | dont forget condoms bc my izzy is 12 years old and i cant have her catching something |
| BOLLU | Ok |
| BOLLU | Location |
| UC1 | let me know when youre getting close. the $150 is for half hour full sex no anal shes too  little |

10.    UC1 then provided BOLLU the address of a hotel in Manchester, NH ("Hotel") as the location of the date with the 12-year-old girl. BOLLU then indicated that he would plan to come the following evening, November 15, 2024, to have sex with the 12-year-old girl.

11.    On November 15, 2014, BOLLU re-initiated the conversation with UC1. BOLLU
through text messages with UC1 and phone calls with other undercover agents agreed to pay $100
to have sex with the 12-year-old girl:

| BOLLU | Hi |
|-------|-----|
| BOLLU | Gm |
| BOLLU | There |
| UC1 | hey hun.. just getting goin today how r u? |
| BOLLU | Good |
| BOLLU | How are you |
| UC1 | good hun u ready to party? |
| BOLLU | Yes |
| BOLLU | Can I have a pic of izzy please |
| BOLLU | There |
| UC1 | no more pics! I told u ! we dont mk $$ sending pics |
| BOLLU | Just one pic |
| BOLLU | Just one |
| UC1 | nope |
| BOLLU | I will not ask again |
| BOLLU | I just need one |
| BOLLU | Pic |
| UC1 | dude ur kinda sketch u told me u were comin n i sent u the address n then u didnt come.. i feel like ur just trying to get free pics |
| UC1 | if this isnt ur thing its cool i told u my girls are specialty n are not for everyone |
| BOLLU | Ok sorry |
| BOLLU | I will be there at 8.00 pm today |
| BOLLU | Same location right |
| UC1 | no need to apologize just lmk if ur coming so i can have her ready. hmu when ur ready and i will let you know 😊 |
| UC1 | shell be ready and excited to see you 😊 |
| BOLLU | Ok same address right |
| UC1 | hun for our safety i will let u know when ur ready .. hope u understand |
| BOLLU | Ok |
| UC1 | just bring condom since u dont want bare ok |
| UC1 | i forgot how much time u want.. did u want hour or just hh? |
| BOLLU | You don't have condom |
| BOLLU | First I want hh |
| UC1 | okay itll be $150 but no rough stuff bc shes young.. lmk if thats okay with u  but the $150 is for full service |
| BOLLU | Ok |

| UC1 | most clients prefer their own condom n reason i am asking 😊 |
|---|---|
| BOLLU | I really don't have condoms so can you provide |
| BOLLU | There |
| UC1 | ill try hun i just dont know how many ill have left by the time u get here.. |
| BOLLU | I just need one |
| BOLLU | And can I know how many time I can ejacuate a in 30 min |
| UC1 | however multiple shots on goal u can do in ur time is all good |
| UC1 | u pay for ur time hun |
| BOLLU | Ok |
| BOLLU | Can I know qv price |
| UC1 | quick visit is $100 hun |
| BOLLU | Ok |
| BOLLU | Can I call you once |
| BOLLU | [Phone call] |
| BOLLU | There |
| UC1 | ya you can call hun |
| BOLLU | Just now I called |
| BOLLU | You are not lifting the call |
| UC1 | oh sorry ill call you back |
| BOLLU | Can I call now |
| BOLLU | [phone call] |
| UC2 | [phone call] |
| UC1 | let me know ur on the way jut want to mk sure izzy is ready for ya.. shes very excited to see you 😊 |
| BOLLU | Ok |
| BOLLU | Can I have a video verification it showing me your number if spam risk |
| BOLLU | Can I have video verification |
| BOLLU | Please |
| UC1 | dude its not like my number is going to come back to my name?!? like seriously! i dont do video i told u already |
| BOLLU | But it showing me your number is spam risk |
| BOLLU | Can you please just 5 sec |
| BOLLU | Video verification |
| UC1 | dude STOP asking for video!!! NO VIDEO!!! If u dont want to come its fine!! But no video!!!!! I already talked to you on the phone. |
| BOLLU | It least 5 sec video |
| BOLLU | Please |
| BOLLU | Or can I have a video than |
| BOLLU | Just for 5 sec |
| UC1 | Dude i already told u NO!!!! stop asking! its not going to happen i dont do that. okay! |
| BOLLU | Can I have atleast a pic that showing hand |
| BOLLU | Please |

7

| UC1 | a pic with what?? a hand?? |
|---|---|
| UC1 | of which girl?? |
| UC1 | and this would be the last thing im sending!!!! if u dont want to come dont but stop asking for video or verification!! I dont operate like that |
| BOLLU | Izzy pic |
| BOLLU | Just one pic |
| UC1 | Last Photo!!! Izzy saying hi! [picture sent] |
| BOLLU | I think it's a photo shop |
| BOLLU | Same pic edited |
| UC1 | okay dude nothing is photo shopped okay! im about to block you! these are real pics im sending if u dont like them thats on you!!! |
| BOLLU | [photo sent] |
| BOLLU | But they seem to be same |
| BOLLU | Ok iam gonna come |
| UC1 | well dude you wanted specific pics and im sending wat u asked for.. i dont even know how to change pics |
| UC1 | and if u dont want to come its cool too!!! u decide |
| BOLLU | Ok can I have another pic just different one |
| BOLLU | I really want to come but |
| BOLLU | I just want to verify |
| UC1 | NOPE!!! No more photos! Ive already sent more than I usually do. I spoke to you on the phone. Im scared too. Im scared all the time. I have lots to lose. just stop texting me if ur not coming. I have lots of guys messaging. Just please stop asking for verification. Just stop! |
| BOLLU | I really want to come |
| BOLLU | I just need one pic |
| UC1 | stop texting me unless ur coming. im not sending anymore pics. NO MORE!!!!!! |
| BOLLU | Ok |
| BOLLU |  [phone call] |
| BOLLU | Hi there |
| BOLLU |  [phone call] |
| UC2 |  [phone call] |
| BOLLU |  [phone call] |
| BOLLU |  [phone call] |
| BOLLU | Hey<br>I am 5 mins away |
| BOLLU | Just want to let you know |

12.     BOLLU also communicated with UC1 through the second identical advertisement on November 15, 2024, during the same period of time that he was communicating with UC1 through the first identical advertisement:

| BOLLU | Hi |
|---|---|
| BOLLU | Hi |
| BOLLU | There |
| UC1 | HI |
| BOLLU | Available |
| UC1 | I got couple girls available.  I negotiate deal.  No extras.  No pics or video.  U come have fun pay and leave quietly |
| BOLLU | Ok |
| BOLLU | Can I know the price |
| UC1 | I got 12 yo Izzy and 14 yo Laila.  Prices depend on how many u want and what u want |
| BOLLU | 12 yo? |
| UC1 | thats their ages. not their sizes |
| BOLLU | What 12 yo |
| UC1 | yes. 12 years old but she has experince with men |
| BOLLU | Can I have video verification |
| BOLLU | Just for 5 sec |
| UC1 | NO FUCKING WAY>  JUST TOLD U THAT.  U ASK AGAIN I DONE TALKING |
| BOLLU | Ok |
| BOLLU | Can I atleast have a pic |
| UC1 | U HAVE PICS.  We talked earlier.  I aint fucking around with u any more. |
| BOLLU | Can I know price |
| UC1 | QV is $75.  Half hour is $150.  Hour is $300.   You must have condom or pay extra $50. |
| UC1 | you want 14 year old girl or 12 year old girl. |
| BOLLU | Location |
| BOLLU | 14 |
| BOLLU | Did you have more than 18 years girl |
| UC1 | NO I have those 2 girls.  If you dont like younger.   GO pick another ad |
| UC1 | Do you want butt stuff.  Do you have condoms. |
| UC1 | how ong do you want to screw her for? |
| BOLLU | I don't have condom |
| BOLLU | Hh |
| UC1 | Half hour.  No condom is $225. Liala the 14 year old.  Full sex.  Deal or not? |
| BOLLU | Will you provide condom |

| BOLLU | I need condom |
| BOLLU | First I will try qv |
| UC1 | I will if you send me picture of your cash right now to show u are for real! |
| BOLLU | Iam gonna come |
| BOLLU | At 8.00pm |
| BOLLU | Just I need the address |
| UC1 | if u schedule 15 minutes thats all you get cuz i schedule appointments. |
| BOLLU | Ok I will be there at 8.00 |
| UC1 | You will get address when you message me back at 8pm and show me you got the money in cash |
| BOLLU | Can I know the address |
| UC1 | not giving it to you now. |
| UC1 | We are in Manchester New Hampshire.  Message me at 8pm.  I will have Laila ready for 30 minutes.  Send pic of cash and i give you condom.  we talk, you fuck, you pay and you leave |
| UC1 | no videos, no pictures, so dont ask |
| UC1 | if you get out of work earlier.  Message me then. |
| UC2 | [Phone call] |
| BOLLU | [Phone call] |

13.     As noted in the charts above, BOLLU also had phone calls with the Advertisement

Numbers several times on November 15, 2024, and spoke to another undercover agent ("UC2"),

who was posing as the person who posted the Advertisements and the user of the Advertisement

Numbers. During one call, BOLLU asked to speak with the 12-year-old girl. In a subsequent call,

another undercover agent ("UC3") spoke with BOLLU and UC2. UC3 used a high-pitched voice

and posed as the 12-year-old girl. On this call, BOLLU confirmed that he wanted to have sex with

the 12-year-old girl and that he wanted her to wear black panties when they met.

14.     Shortly thereafter, BOLLU called one of the Advertisement Numbers and indicated

that he wanted to bring a "friend" to the planned encounter. In a subsequent call with the -0801

number, UC2 spoke to BOLLU and confirmed that the friend also wanted to pay to have sex with

the 12-year-old girl, one after the other. On that call, UC2 asked to speak to BOLLU's friend and

BOLLU was then joined on the call by his friend, now believed to be KOTESHWARA JONNAGODDA. JONNAGODDA spoke to UC2 and indicated that he wanted to have sex with the 12-year-old girl, that he understood that the purported girl was 12-years old, and that he was not into "rough stuff." JONNAGODDA also agreed to pay $100 to have sex with the 12-year-old girl for 15 minutes. He confirmed that he wanted to have sex with the same 12-year-old girl as BOLLU, after BOLLU's time was finished. JONNAGODDA also confirmed that he and BOLLU would bring condoms. UC2 asked JONNAGODDA and BOLLU to wait at a nearby pharmacy.

15.     BOLLU resumed text messaging with the Advertisement Numbers, indicating that he and JONNAGODDA had gone to a nearby pharmacy before arriving at the hotel.

16.     After BOLLU messaged to say he was at the Hotel, UC2 called BOLLU and asked him to drive from the front to the back of the hotel to meet UC2. At the hotel, a Black SUV pulled into the back area of the Hotel parking lot. After UC2 approached the vehicle, BOLLU rolled down his window and had a conversation with UC2. BOLLU and JONNAGODDA were together in the car.  BOLLU was the driver and JONNAGODDA was seated in the passenger seat. During the conversation, both BOLLU and JONNAGODDA stepped out of the vehicle and continued to speak with UC2 in the parking lot beside the vehicle.  UC2 confirmed with both BOLLU and JONNAGODDA that they each wanted to have sex with the 12-year-old girl one at a time. UC2 asked both BOLLU and JONNAGODDA to show her the cash for the agreed transaction and both of them confirmed that they had the agreed amount.

17.     Law enforcement then arrested BOLLU and JONNAGODDA and took them into custody in the parking lot.  BOLLU's Black iPhone was seized from his person. The Gray iPhone was seized from JONNAGODDA's person. During a search of the car, law enforcement officers located the White iPhone in the center console. Officers seized each of the TARGET DEVICES.

18.     Officers then placed a call to the -0801 number that had been used to communicate with UC1 and observed the Black iPhone ringing.

19.     During a search of BOLLU's person at the time of his arrest, Officers located the Black iPhone, one condom, car keys, one $100 bill, two $20 bills, and one $10 bill.

20.     During a search of JONNAGODDA's person at the time of his arrest, Officers located the Gray iPhone, two bank cards, two condoms, a $100 bill, and five $1 bills.

21.     During a search of the vehicle, in addition to the White iPhone, Officers located a box of condoms, several condoms outside of the box, a wallet, and a driver's license belonging to BOLLU.

22.     Officers subsequently reviewed security video footage of BOLLU and JONNAGODDA inside a nearby Rite Aid pharmacy shortly before they arrived at the hotel. In the video, JONNAGODDA is seen purchasing a box of condoms. Officers also obtained a receipt from the Rite Aid pharmacy which matches this purchase.

23.     Officers also obtained information that the car was a rental car that had been rented in BOLLU's name.

24.     Because BOLLU communicated with UC1 via text message, and because BOLLU had the Black iPhone phone in his possession at the time of his arrest, there is probable cause to believe that the Black iPhone contains his conversations with UC1 regarding his agreement to engage in commercial sex with a minor and may contain other evidence of this or related offenses.

25.     Because of the amount of time that passed during UC1's conversations with BOLLU, because BOLLU apparently invited JONNAGODDA to also communicate with UC1 and UC2, because JONNAGODDA also indicated to UC2 that he intended to engage in commercial sex with a minor, there is probable cause to believe that JONNAGODDA and  BOLLU

communicated regarding the Advertisements and regarding BOLLU and JONNAGODDA's plan to engage in commercial sex with a minor. Because the Gray iPhone was in JONNAGODDA's possession at the time of his arrest, there is probable cause to believe that the Gray iPhone contains evidence of communications between JONNAGODDA and BOLLU regarding their intent to engage in commercial sex with a minor and may contain other evidence of this or related offenses.

26.    Because both BOLLU and JONNAGODDA indicated an intent to engage in commercial sex with a minor at the Hotel and because the White iPhone was located in the car that BOLLU and JONNAGODDA arrived in, there is probable cause to believe that the White iPhone contains BOLLU and JONNAGODDA's communications with one another regarding their intent to engage in commercial sex with a minor, and may contain other evidence of this or related offenses.

## CHARACTERISTICS OF INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

27.    Based on my training and experience, I am aware that individuals who have a sexual interest in children often use cell phones to communicate with multiple minors or adult intermediaries for sexual purposes. I am also aware that said individuals may have multiple cell phones to communicate with minors or other individuals about engaging in sexual activity with minors to avoid detection by others, including law enforcement. I am aware that individuals often use websites including but not limited to skipthegames, onlyfans, megapersonals, onebackpage, and adultsearch to engage in prostitution and/or sex trafficking of minors.

28.    Furthermore, I know, from my training and experience, individuals with a sexual interest in children tend to use their mobile devices to access websites advertising commercial sex, such as the website on which the Advertisement was posted.

29.     Additionally, I know, from my training and experience, that individuals with a sexual interest in children tend to view and maintain child pornography on their electronic devices. As a result, law enforcement is generally able to recover media files of child pornography from electronic devices, and may be able to recover evidence of such files even if the files have been deleted.

30.     These individuals may also have images of minors that do not rise to the level of child pornography, but which nonetheless provide insight and corroboration into their deviant sexual fantasies involving minors.  For instance, offenders have been known to take and maintain photographs and video recordings of fully clothed minors, not just in sexually provocative poses, but in public places and elsewhere (such as beaches, parks, and so forth), to collect, review, and fulfill their sexual fantasies.  This sort of material, although not overtly sexual, further demonstrates that the defendant has a sexual interest in minors.

31.     Obtaining information for 30 days prior to the arrest will help combat any defense that BOLLU or JONNAGODDA traveled to the hotel in Manchester, NH, as part of some type of routine or schedule or that either did so in an attempt to rescue or otherwise assist the purported youth.

**Investigators' Possession of the Target Equipment**

32.     After taking possession of the TARGET DEVICES investigators placed the TARGET DEVICES in airplane mode.  The TARGET DEVICES are currently being stored by investigators at 275 Chestnut St, Manchester, NH.  From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to

14

this investigation, in substantially the same state as they were when it first came into the investigators' possession.

## TECHNICAL TERMS

33.    Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.    Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a

variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite

contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).

Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

34. Based on my training, experience, and research, I know that the Target Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

35. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

36.     Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Target Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual

information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

37.  Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

38.  Manner of execution.  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

39.  From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use mobile phones to carry out, communicate about, and store records regarding their daily activities.  These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet-based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; arranging

for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

40.    I know, based on my training and experience, that individuals who peruse websites like the one where the Advertisements were posted often do so regularly. Familiarity with abbreviations and terms like "qv" can indicate that a person has experience with prostitutes, whether adult or child, in the past. I also know that evidence of engaging in prostitution on past occasions or evidence of a prior sexual interest in children can indicate an individual's intent on the date of the instant offense.

41.    From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B in mobile phones, computer hardware, computer software, and storage media.

42.    The warrant I am applying for would permit law enforcement to obtain from BOLLU and/or JONNAGODDA the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

      a.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices like iPhones, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices

offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.    If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or

alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.   The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.   I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  The warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of BOLLU and JONNAGODDA, to the fingerprint scanner of the device; (2) hold the device in front of the face of BOLLU and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

[THIS SPACE INTENTIONALLY LEFT BLANK]

## **CONCLUSION**

30.     Based on the information provided above, I respectfully submit that there is probable cause to obtain a search warrant for the TARGET DEVICES, as more fully described in Attachment A, to seek the items described in Attachment B. Because the TARGET DEVICES are already in law enforcement's possession and the execution of this warrant does not involve the physical intrusion onto a premises, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.


/s/ Lori Robinson_____
Lori Robinson, Special Agent
Homeland Security Investigations


Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone, on this 16th day of November, 2024.


 /s/ Andrea K. Johnstone
_____
HONORABLE ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE
11/16/2024

25

**ATTACHMENT A**
**Equipment To Be Searched**

The equipment to be searched is a Black iPhone seized from SHARATH CHANDRA
BOLLU on November 15, 2024, a Gray iPhone seized from KOTESHWARA JONNAGODDA
on November 15, 2024, and a White iPhone, seized from the car in which SHARATH
CHANDRA BOLLU and KOTESHWARA JONNAGODDA were arrested on November 15,
2024 (the "Target Devices").  The Target Devices are currently located at the HSI Office at 275
Chestnut St., Manchester, NH. This warrant authorizes the forensic examination of the Target
Devices for the purpose of identifying the electronically stored information described in
Attachment B.

**ATTACHMENT B**
**Items to Be Seized**

I.      All records, in whatever form, that constitute evidence, fruits, or instrumentalities of 18

U.S.C. §§ 1591(a)(1) & (b)(1) and 1594(a) & (c) and involve SHARATH CHANDRA BOLLU

and KOTESHWARA RAJU JONNAGODDA for the period from October 14, 2024 - present,

including those related to:

A.      Any correspondence with the Advertisement Numbers (as defined in the affidavit);

B.      Any correspondence between BOLLU and JONNAGODDA on November 14, 2024 and November 15, 2024;

C.      Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, e-mail messages, chat logs, electronic messages, or other digital data files) pertaining to the sex trafficking of children, attempt to engage in sex trafficking of children, commercial sex, prostitution, and a sexual interest in children;

D.      Any web or browser history including but not limited to skipthegames, onlyfans, megapersonals, onebackpage, and adultsearch or any other site advertising escorts, commercial sex, prostitution, or the sex trafficking of children;

E.      The payment, receipt, transfer, or storage of money or other things of value by BOLLU and JONNAGODDA, pertaining to the sex trafficking of children, attempt to engage in sex trafficking of children, commercial sex, prostitution, and a sexual interest in children;

F.      The travel or whereabouts of BOLLU and JONNAGODDA on November 14 and November 15, 2024;

G.    For the Target Devices:

    1.    evidence of who used, owned, or controlled the Target Devices;

    2.    evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;

    3.    evidence of the attachment of other computer hardware or storage media;

    4.    evidence of counter-forensic programs and associated data that are designed to eliminate data;

    5.    evidence of when the computer equipment was used;

    6.    passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

    7.    records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage; and

    8.    Serial numbers and any electronic identifiers that serve to identify the Target Devices.

II.    During the execution of the search of the Target Devices described in Attachment A, law enforcement personnel are authorized to (1) press or swipe BOLLU and/or JONNAGODDA's fingers (including thumbs) to the fingerprint scanner of the Target Devices; (2) hold the Target Devices in front of BOLLU and/or JONNAGODDA's face and activate the facial recognition feature, for the purpose of attempting to unlock the Target Devices in order to search the contents as authorized by this warrant.

28

## DEFINITIONS

For the purpose of this warrant:

A.    "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

B.    "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.    "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.    "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

E.    "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.    "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.